MAY, J.
John M; Zuccare'lli (“defendant”) appeals an adverse judgment in a civil rights action. He argues the court erred in denying his request for qualified immunity, and that neither the liability nor the damages decisions are supported by competent substantial evidence. We agree with him that the plaintiffs failed to prove liability against the defendant and reverse.
The case evolved from a dispute between the plaintiff property owners, their town, and its commissioners and employees concerning the construction of the plaintiffs’ home.[1] The plaintiffs believed the defendants discriminated against them in the enforcement of town ordinances and the building code. They accused the town and its commissioners and employees of selective enforcement and violations of their donstitutional rights. The dispute ultimately led to litigation.
The plaintiffs filed a complaint against the town, its police department, the defendant, and three other town commissioners. In August 2008, the plaintiffs moved for a temporary injunction. They alleged the town: (1) directed Florida Power & Light to turn off their power to force them into leaving their property; (2) harassed them; and (3) filed a separate lawsuit to remove them from their home. The' court denied the motion.
The town then moved for a temporary injunction to require the plaintiffs to vacate their property and not occupy it until the issuance- of a certificate of occupancy. The trial court granted the temporary injunction. It enjoined the plaintiffs from occupying their property until they received a certificate of occupancy.
The plaintiffs eventually filed their third amended complaint, in which they added the police chief as a defendant and alleged thirteen claims against the various defendants. The claims included:
(1) section 1983 violations of their rights to freedom of speech, against unreasonable searches, equal protection, and substantive and procedural due process;
(2) declaratory and injunctive relief;
(3) tortious interference;
(4) Sunshine Law violations; and
(5) negligence.
The defendant answered and asserted several affirmative defenses. He and the other individual defendants alleged they acted within the scope of their discretionary authority as representatives of the town and were entitled to qualified immunity.
The trial court entered a final summary judgment in favor of the defendants on the procedural due process claims and a final judgment on the declaratory relief claim. The trial court also found the town ordinance sections to be valid. We affirmed per curiam. Barfield v. Town of Jupiter *402 Inlet Colony, 145 So.3d 106 (Fla. 4th DCA 2013) (unpublished table decision). The trial court later entered a final summary judgment in favor of the defendants on the tortious interference claim.[2] The remaining case proceeded to a jury trial.
Plaintiffs’ counsel read the pre-trial stipulation to the jury. He described the town of 235 single-family homes governed by a mayor, vice mayor, and three commissioners, who volunteered their service. The five commissioners performed various municipal duties, including building and zoning.
In February 2003, the wife was elected to the town commission and appointed to act as building and zoning commissioner. In May 2003, the town developed its building permit structure. It charged permitting fees of three percent of the contract amount or reasonable construction value if no contract existed.
The town did not have a building department. From 2003 through 2008, the town contracted with Tequesta to provide a licensed building official to review building plans and permit applications. The town entered an agreement with Bureau Veritas to provide a licensed building official in September 2008.
The plaintiffs purchased their property in 1993. In May 2005, they submitted plans to construct a 10,225 square foot home on their property. They applied for a permit as owner/builders and represented the value of the construction as $400,000. The town issued the permit on August 22, 2005.
Under the town’s code, construction was required to be completed within twelve months. If not, the owner was required to obtain a renewal permit for three percent of the contract price or value of construction. Once the fee was paid, construction could continue for an additional six months. The town had a reconciliation process to adjust for any difference between the actual construction costs and the amount represented at the time of permitting.
The wife used the town commission meetings to express her concerns about: (1) the drainage condition at her property; (2) monies charged for permits; and (3) the propriety of transferring town funds to a local bank where the defendant and one of the commissioners maintained an interest. She believed the defendant was upset with her when she did not agree with him at commission meetings.
According to the wife, by the time their building permit was issued, she was not being informed about town building matters even though she was the building and zoning commissioner. She testified that the defendant told her “that no permit was going to go out of that town hall without his final approval.”[3]
During the first eight months of 2005, the wife continued to express her concerns about the permit structure. She testified the police wrote reports on her property at each of their three shifts. She complained to Commissioner Pierson about his bushes and the lack of a fence around his pool. According to her, the commissioner was *403 upset, and the defendant said he would handle the situation.
Another resident, and friend of the plaintiffs, testified that at a commission meeting, the defendant began a long discussion about the plaintiffs’ permits and their uncooperativeness with the town. She testified that the defendant made extremely negative, rude remarks having nothing to do with the agenda. He would put “his fist down ,.. saying that I’m in charge here, and this isn’t going to happen.”
She also testified that the police constantly watched the plaintiffs and put stop work orders in front of their house. “The town did give work orders, stop work orders and other citations to the [plaintiffs] when they were not giving them to other people.” She admitted that she “received numerous tickets” for parking in violation of the town code. She believed she received citations because she was a friend of the wife’s and spoke up for her. But, the defendant did not receive citations for alleged parking violations.
The defendant testified that he was the town mayor and served as the police commissioner. The town ordinance was admitted into evidence. Section 2, article IV provided:
The Mayor shall be the chief executive officer of the municipality and Chairman of the Commission and it shall be his duty to attend to the proper and effective enforcement of the laws and ordinances of the municipality, under the over-all supervision of the Commission. ... In the case the Commission shall provide for a Chief of Police or Marshal, such person shall attend to the proper and effective enforcement of the laws and ordinances of the municipality under the over-all supervision of the Commission.
As police commissioner, the defendant oversaw the town’s police department. He did not, however, have anything to do with the building official. The police chief testified the defendant was not his supervisor.
The defendant testified that the plaintiffs’ mantra was to complain about the town drainage and flooding issues. He admitted he was upset when the wife expressed concerns about a hurricane preparedness plan and when the plaintiffs complained that his father had pavers in his driveway without a permit. The husband’s call-to-action letters also upset him, “but not to the point that [he] was yelling and jumping up and down.”
The plaintiffs testified to numerous citations for a variety of violations: workers arriving early, signage, lack of pool fencing, landscaping, fugitive dust, kayaks, and a visible storage shed. The husband even took pictures of other residents he felt were in violation of the town’s ordinances, but was told that the other residents were compliant with existing ordinances. In fact, the plaintiffs admitted being in violation of the ordinances where they had been cited, but felt they were treated dissimilarly to other residents.
While Commissioner Comerford admitted the plaintiffs received citations in some instances when others received warnings, the police chief and Commissioner Comer-ford testified that the other residents were compliant with the town’s ordinances on signs and pool fencing.
The wife testified that on May 12, 2006, they received a letter requesting verification of values because their permit was going to expire, but she was not aware .of anyone who was asked to verify values before renewal. She testified that they requested a building permit extension after Hurricane Wilma, but it was not granted. Others requested the same extension and received it.
*404 Commissioner Comerford confirmed that the plaintiffs’ permit extension request was denied, but it was brought before the entire commission, on which the wife was sitting. The wife testified that renewal permits lasted for six months, but the plaintiffs did not think they received six months because of an issue on the starting date. She testified that they were required to participate in code enforcement hearings before a special master. She was unaware of any other residents that were required to do the same. They did not have to pay many of the fines because the special master’s decisions were reversed.
The wife admitted that many of the citations were for valid violations they committed, including parking trucks and trailers overnight, improper signs, - fugitive dust, and stop work orders.[4] •
The police chief testified that the building commissioner or building official issued citations for violations of the Florida Building Code and the town police delivered them. Officer Curran testified that town police officers had complete discretion to cite a person when they observed a violation. Commissioner Comerford testified that the defendant had no involvement in building-related disputes with the plaintiffs, The defendant was not involved in fugitive dust complaints, worker hours, worker licenses, stop work orders, worker registration requirements, worker insurance, or property signs. Commissioner Comerford testified the defendant “had nothing to do with the work site.”
The husband testified that in September 2005, the defendant' angrily told him “he would never let us have a [certificate, of occupancy], [or] move into the house.” In April 2007, the defendant complained to the town police department about men cutting tile in the rear of the plaintiffs’ home due to lack of an occupational license.[5] He also complained about an unregistered commercial vehicle parked in front of the plaintiffs’ home. The town police responded and photographed the truck.
In August 2005, the defendant complained to the town police twice more regarding construction activity at the plaintiffs’ home, The police called the Department of Environmental Protection regarding the plaintiffs’ mangrove trees after the defendant called them.
The wife testified that they did not obtain a certificate of occupancy until August 2011, six years after construction started; At that point, the defendant was no longer mayor.
By the time the case went to the jury, only the defendant, town, and police chief remained as defendants. The jury found:
(1) the defendant intentionally committed acts that violated the plaintiffs’ free speech rights, but his acts did not proximately cause damages;
(2) the police chief did not intentionally commit acts that violated the plaintiffs’ free speech rights;
(3) the defendant intentionally violated the plaintiffs’ equal protection rights by selectively enforcing town ordinances against them so as to treat them less favorably than similarly-situated persons; his actions were committed with a discriminatory or improper purpose, and were the proximate cause of the plaintiffs’ damages; and
(4) the police chief did not intentionally violate the plaintiffs’ equal protection rights.
*405 The jury awarded $1,000,000 to the wife, but nothing to the husband. The jury assessed $100,000 in punitive damages against the defendant. The jury found in favor of the defendant and the police chief on the Fourth Amendment claims, but against the town on the negligence claim. The jury awarded $76,000 in damages assessed against the town.
The defendant moved for a new trial and to set aside the verdict. The trial court denied both motions. The trial entered final judgment in favor of the plaintiffs and against the defendant and awarded the wife $1,100,000 in damages. From this judgment, the defendant has now appealed.
The defendant argues he is entitled to qualified immunity due to the lack of evidence to support a violation of the plaintiffs’ constitutional rights. He also argues the plaintiffs failed, in their burden to prove his liability and the amount of damages awarded. We agree with him in part and reverse the judgment in part.
The defendant argues the plaintiffs failed to establish he selectively enforced any of the town’s ordinances against them. No evidence existed that he enforced any ordinance. He could not even legally direct the enforcement of any ordinance. In fact, the evidence established that he had nothing to do with the issuance of citations and had no supervisory authority over the police chief or the officers. He also argues the plaintiffs were unable to establish a comparison group of otherwise similarly situated residents.
The plaintiffs respond that the record shows the defendant selectively enforced town ordinances against them when they challenged or impugned his integrity. The record shows they were similarly situated to other residents in all relevant respects, but they received citations.for a wide variety of offenses that were not given to others. The defendant participated in the selective enforcement both directly as mayor and police commissioner and indirectly through his supervisory authority.
“A jury verdict must be sustained if it is supported by competent substantial evidence.” State, Dep’t of Children & Family Servs. v. Amora, 944 So.2d 431, 435 (Fla. 4th DCA 2006). “Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred.” NITV, L.L.C. v. Baker, 61 So.3d 1249, 1253 (Fla. 4th DCA 2011) (quoting De Groot v. Sheffield, 95 So.2d 912, 916 (Fla.1957)).
Selective enforcement and “class of one” claims have been recognized since before the alleged selective enforcement here occurred. Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313-14 (11th Cir.2006). “It is well settled that unequal application of a facially neutral statute may violate the Equal Protection Clause.” Strickland v. Alderman, 74 F.3d 260, 264 (11th Cir.1996) (citing Eide v. Sarasota Cty., 908 F.2d 716, 722 (11th Cir.1990)).
“The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state’s jurisdiction against' intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.” Sioux City Bridge Co. v. Dakota Cty., Neb., 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923) (citation omitted).
“To prevail on ... a selective enforcement claim, that [a][c]ity’s [ordinance was applied to them, and not other[s] ... [plaintiffs must..show (1) that they were treated differently from other similarly situated individuals, and (2) that [defendant unequally applied a facially neutral ordi *406 nance for the purpose of discriminating against [pjlaintiffs.” Campbell, 434 F.3d at 1314.
Here, the evidence does not support a finding that the defendant enforced any town ordinance. “Supervisors can be liable under section 1983 only if they actually participated in the allegedly wrongful act, or if a causal connection exists between their acts and the alleged violation.” Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560-61 (11th Cir.1993). There was no evidence to show that the defendant personally enforced any of the town ordinances against the plaintiffs.
Commissioner Comerford acted as the building commissioner for construction on the plaintiffs’ property. The defendant testified that he was in charge of the police, but code enforcement was the building official’s and building commissioner’s job. The police chief testified that the defendant was not his supervisor. The town commission oversaw the town police for addressing community concerns. The building commissioner or building official issued citations for building code violations. Officer Curran testified that town police had complete discretion to cite a person in violation of a town ordinance.
Commissioner Comerford testified the defendant did not have any involvement in building-related disputes with the plaintiffs. He was not involved in fugitive dust complaints, worker hours, worker licenses, stop work orders, worker registration requirements, worker insurance, or property signs. He “had nothing to do with the work site.”
The plaintiffs cite the town ordinances in arguing the defendant, as mayor, had the “duty to attend to the proper and effective enforcement of the laws and ordinances of the municipality.” However, they failed to include the next part of the ordinance, which states that the town mayor has the “duty to attend to the proper and effective enforcement of the laws and ordinances of the municipality, under the over-all supervision of the Commission.” The ordinance enforcement is overseen by the entire commission, a commission on which the wife served, not just the defendant.
The plaintiffs argue the defendant’s direct liability is shown through his four complaints to the town police, which followed his threat to insure they would never get a certificate of occupancy. However, the evidence supports only that the defendant, as the plaintiffs’ neighbor, made complaints to the town police. There is no evidence that he personally enforced the violations. Reporting an alleged violation as a next door neighbor is not the equivalent of selectively enforcing or directing the town police to selectively enforce the town’s ordinances. Only the town police had the discretion and authority to cite the residents.
The dissent suggests that we have “reweighed the evidence and come to a different conclusion.” On the contrary, we went in search of evidence to support the jury’s verdict and found none with regard to this defendant. It simply does not exist.
The plaintiffs next argue, the defendant had supervisory liability. See Gonzalez v. Reno, 325 F.3d 1228, 1234-36 (11th Cir.2003). This argument is without merit. The plaintiffs alleged in their third amended complaint that the “Individual Defendants” “fail[ed] to properly supervise the Police in the Police’s conduct of ... selectively enforcing the Town codes.” However, the jury found the police chief was not liable for selective enforcement.
In fact, the only person the jury found liable for selective enforcement was the defendant. The defendant could not have been found liable under a supervisory theory if no one under his supervision was *407 found liable. See Gonzalez, 325 F.3d at 1234-35. Because the evidence does not support the jury’s finding that the defendant personally selectively enforced the town ordinances or supervised anyone who selectively enforced the town ordinances against the plaintiffs, the evidence does not support the jury’s verdict. We therefore reverse the judgment against the defendant.

Reversed and remanded.

KLINGENSMITH, J., concurs.
GROSS, J., dissents with opinion.

. The plaintiffs are a husband and wife, who owned property in the town. The defendants consisted of the town, the mayor, three commissioners, and the police chief. The plaintiff wife was also a commissioner. The judgment was entered against the defendant former ' mayor and the town. Only the former mayor has appealed.

. The plaintiffs dismissed their claims against Commissioner Disarno. At trial, the plaintiffs dropped Commissioners Comerford and Pier-son.

. Commissioner Comerford acted as the building commissioner for the plaintiffs’ construction project. In February 2006, the town commission appointed the wife as roads and walkways commissioner and Commissioner Pierson as building and zoning commissioner.

. The record shows the defendant received two "Truck Overnight Citation[s]” in 2007.

. The defendant resided next door to the plaintiffs.